

NUMBER 13-08-00239-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JESUS GARCIA MUÑOZ,                                    **Appellant,**

**v.**

THE STATE OF TEXAS,                                    **Appellee.**

**On appeal from the 36th District Court of San Patricio County, Texas.**

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Vela
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Jesus Garcia Muñoz, of three counts of aggravated assault and two counts of engaging in deadly conduct with a punishment enhancement for engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. §§ 22.02(a), 22.05(b), 71.02(a)(1) (Vernon 2003 & Supp. 2008).[1]  The jury assessed punishment at ten years'

---

[1] Generally, an aggravated assault conviction constitutes a second-degree felony. TEX. PENAL CODE ANN. § 22.02(b) (Vernon Supp. 2008). Moreover, section 22.05(e) of the penal code provides that a conviction for engaging in deadly conduct—such as knowingly discharging a firearm at another person—is a third-degree felony. *Id.* § 22.05(b), (e) (Vernon 2003). However, the jury also concluded that appellant committed the

incarceration in the Texas Department of Criminal Justice-Institutional Division with no fine for the two counts of engaging in deadly conduct and a probated ten-year sentence with no fine for the three counts of aggravated assault.[2] By five issues, appellant contends that: (1) the evidence is legally and factually insufficient to support his conviction; (2) the evidence is legally and factually insufficient to support the jury's conclusion that he was a member of a criminal street gang; and (3) the trial court erred in allowing lay testimony pertaining to criminal street gangs. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 2007, a San Patricio County grand jury indicted appellant and his co-defendant Guadalupe C. Ortiz with three counts of aggravated assault and two counts of engaging in deadly conduct corresponding to an alleged drive-by shooting occurring on June 20, 2007.[3] Specifically, the indictment provided that appellant and Ortiz intentionally and knowingly threatened Dennis Limmon Jr., John Limmon, and Juan Garza with "imminent bodily injury by shooting," *see id.* § 22.02(a), and that appellant and Ortiz knowingly discharged a firearm in the direction of a habitation and a vehicle while reckless as to whether the habitation or the vehicle were occupied. *See id.* § 22.05(b). The indictment also contained an enhancement paragraph alleging that appellant and Ortiz committed these offenses while members of a criminal street gang.

---

offenses as a member of a criminal street gang and assessed punishment pursuant to section 71.02 of the penal code, which provides that if a defendant commits or conspires to commit, among other things, deadly conduct or aggravated assault as a member of a criminal street gang, the punishment range is one category higher than the most serious offense. *See id.* § 71.02(a)(1), (b) (Vernon Supp. 2008). Therefore, appellant was subject to the punishment range for first-degree felonies. *See id.*

[2] The punishment range for a first-degree felony is "not more than 99 years or less than 5 years." *Id.* § 12.32(a) (Vernon 2003).

[3] Ortiz is not a party to this appeal.

On March 3, 2008, appellant's jury trial commenced. The State called five witnesses in its case-in-chief—Claudia Olivares, John Limmon, Dennis Limmon Jr., Isaac Leal, and Augustine Perez. The defense also called five witnesses—Daryl Lee Jones, Dorinda Cisneros by deposition, Virginia Lopez, Adelita Baizabal, and Beatriz Garcia.

## A. Olivares's Testimony

Olivares testified that during the month of June 2007, she was living in government housing in Aransas Pass, Texas, with her daughter and that her boyfriend, Juan Garza, was visiting. At about 10 p.m. on the night of June 20, Dennis and John came over to Olivares's apartment. Garza met John outside on the porch, and the two began talking. Dennis remained in the vehicle. Olivares remained inside the apartment tending to her daughter. Approximately ten minutes after Dennis and John had arrived at her apartment, Olivares heard gunshots. Olivares immediately ran to the porch to instruct Garza to come inside. While doing so, Olivares noticed Ortiz's maroon car with a head hanging out the passenger window.[4] Olivares then went inside the apartment and closed the front door. She heard additional gunshots and subsequently ran to the back of the apartment with her daughter. In all, Olivares noted that she heard more than five gunshots. Olivares stated that her apartment had a back door that led to a parking lot. Olivares proceeded toward the back door with her daughter in tow. Olivares wanted to run to her next-door neighbor's apartment, but she stopped because she saw Ortiz's vehicle coming around the back of the apartment. Olivares ran to the front door where she found Garza and John still on the porch. She then got in her car and drove with her daughter to a nearby Sonic to call the

---

[4] Olivares testified that she had known Ortiz since they were younger.

3

police. Garza, Dennis, and John drove away.[5] When Olivares returned to her apartment two days later, she found two bullet holes in her upstairs window with one of the bullets lodged in the window. Shortly thereafter, Olivares called the police to investigate the incident.

## B. John's Testimony

John testified that he was sixteen years old at the time of trial, attended Aransas Pass High School, and lived with his parents and brother, Dennis.[6] John and Dennis got off work at approximately 11:00 p.m. on June 20 and proceeded to Olivares's apartment to meet Garza. When John and Dennis arrived at the apartment, John got out and began talking to Garza while Dennis stayed in the vehicle.[7] The conversation between John and Garza was interrupted by a car with a loud engine coming down the street. John first noticed that the vehicle was "going pretty fast down the road." As the vehicle got closer to the apartment, John observed that it was a "red Mercury or Buick" and that it slowed down in front of the apartment. "At that time I [John] saw the Defendant [appellant] hop up on top of the window seal [sic], reach across the top of the car with a gun and start firing at us." John identified the driver of the vehicle as "Lupe Ortiz"[8] and the shooter as appellant. In describing the gun allegedly used by appellant, John stated that it was "silverish."[9] John testified that appellant had pointed the gun at Garza and him and fired

---

[5] On cross-examination, Olivares noted that Garza was wanted by authorities for another unrelated incident but that she was unaware of his whereabouts.

[6] At the time of the incident, John was fifteen years old.

[7] According to John, Dennis never exited the vehicle while it was parked at the apartment.

[8] Throughout the record, Ortiz is referred to as "Loop" or "Lupe Ortiz."

[9] On cross-examination, John testified that he believed that appellant had used a .45 caliber handgun in committing the offenses.

4

about seven bullets. One bullet hit the wall of the apartment approximately six inches from John's head. John further testified that he was fearful for his life when appellant fired the gunshots. After appellant sprayed the scene with seven bullets, he and Ortiz drove away.

John ran around to the back of the apartment building where he once again saw Ortiz's vehicle. He then ran back around to the front of the apartment. Once he no longer saw Ortiz's vehicle, John, Dennis, Garza, Olivares, and her daughter drove to the nearby Sonic, where Olivares was dropped off so she could call the police. John and Dennis returned home. John later gave a statement to the police regarding the incident.

John testified that he had purchased a Buick LeSabre from his grandfather for $300, and that the vehicle did not have any bullet holes prior to June 20. John identified State's exhibit numbers 2 through 5 as photographs of his vehicle with bullet holes in it. When questioned about his relationship with Garza, John stated that they had first met in the summer of 2006 because the same people were messing with both of them and because Garza was the next-door neighbor of John's friend, Jose Nino. John stated that the people who were messing with Garza and him were members of the Raza Varrios Crips ("RVC"), a criminal street gang in Aransas Pass which is identified by its distinct gang sign and blue bandanas. Both Garza and John had gotten into fights with RVC members in the past.

## C. Dennis's Testimony

Dennis testified that at the time of trial, he was eighteen years old and lived at home with his parents and John. Dennis noted that he knew appellant, Ortiz, and Garza. Dennis and John got off work around "10:30 or 11 o'clock" on the night of the incident. Dennis drove John and himself to Olivares's apartment in John's car so that they could meet with Garza. When they arrived, Dennis stayed in the vehicle while John went up to the porch

5

to speak with Garza. Shortly thereafter, Dennis observed a red Mercury driving by and shooting at them. Dennis had seen the red Mercury before and identified it as Ortiz's vehicle. Dennis testified that the vehicle started down the street driving rapidly but slowed once it was in front of Olivares's apartment. Dennis noticed that appellant was the passenger in the vehicle and that appellant sat on the "window pane and leaned over the car and started shooting." Dennis noted that either Angel Garcia or St. John Lopez, Jr., also known as J.J., was sitting in the back seat of Ortiz's car. Dennis stated that the gun was silver, that it looked like a .45 caliber handgun, and that the shooting was toward John's car and toward Olivares's apartment. John's car was struck by bullets that night while Dennis was inside the car.

Once he heard the gunshots, Dennis put his seat down and leaned back. In all, Dennis heard about six or seven gunshots. Once the gunshots ceased, Dennis instructed John, Garza, Olivares, and her daughter to get inside the car so he could take them to safety at the local Sonic. Olivares and her daughter exited the vehicle once they arrived at the Sonic. Dennis gave the police an oral statement about the incident on the night of the incident and, about a month later, he gave a written statement.

On cross-examination, Dennis admitted that he was indicted for engaging in deadly conduct for allegedly firing a shotgun at the house of appellant's parents later that evening. On re-direct, Dennis testified that appellant yelled out "mother[]fucker" prior to the shooting and that he had ten to fifteen "quarrels" with appellant in the past, the last one occurring approximately one month prior to the incident. In addition, Dennis testified that he was familiar with the RVC in Aransas Pass and was asked to join prior to entering high school. Dennis claimed that appellant (1) had a MySpace page where he claimed to be a member

6

of the RVC, (2) regularly threw RVC gang signs, (3) wore blue clothes and blue bandanas, (4) screamed out "Crip" at Dennis, (5) spoke regularly about RVC before and after Dennis was asked to join, and (6) confronted, harassed, and assaulted Dennis with other RVC gang members in a parking lot and at high school football games. However, he never filed a report with police about any of his prior run-ins with RVC gang members. Dennis admitted that he was not in a gang and was not aware of the legal definition of a criminal street gang.

**D. Leal's Testimony**

Leal testified that he is an investigator for the 36th Judicial District Attorney's Office and that he specializes in investigating gangs and violent crime. In particular, Leal is responsible for identifying gang members and maintaining a local gang database in conjunction with the Texas Department of Public Safety. Leal noted that he: (1) has participated in basic and intermediate gang investigator courses; (2) regularly attends annual gang investigator conferences; (3) teaches police officers about gang investigations; and (4) conducts presentations to public school children about gang prevention. Leal testified that he has had experience investigating gangs in Aransas Pass, including the RVC. Based on his investigation, Leal concluded that appellant was a member of the RVC.[10] Leal relied on appellant's MySpace page which contained "gang-related paraphernalia and other RVC gang members all displaying gang signs, wearing

---

[10] Specifically, Leal noted the following in explaining his conclusion that appellant was a member of a criminal street gang: "On 3-27-07 Jesus Muñoz was documented, reported to be a gang member by a reliable source, frequenting the areas of gangs, associating with known gang members, and using gang dress, hand signs, tattoos or symbols."

7

gang-related paraphernalia were also located."[11]   In identifying a person as a gang

member, Leal noted the following:

> To be confirmed as a gang member[,] the individual has to meet two of the
> following criteria:  Self-admission of gang membership, and that's either by
> virtually acknowledging that they are in a criminal street gang, or that can
> occur non-verbally by the way they dress, act[,] and report themselves to be,
> I.D. by reliable informant[,] or other individual.  A reliable informant could be
> a police officer, a teacher, a counselor, a coach, [or] some person in the
> community.
>       A corroborated I.D. by an informant or other individual of unknown
> reliability, that's going to be somebody that's listed as a confidential
> informant, somebody who gives information on another gang member that's
> in that gang or a rival gang member.  Or frequenting a documented gang
> area, associating with known gang members, and using gang dress, hand
> signs, tattoos or symbols; or evidence of being arrested, taken into custody
> with known gang members for an offense or conduct consistent with criminal
> street gang activity.

Leal stressed that his office works in collaboration with other jurisdictions to identify

potential gang members.  Leal testified that the RVC was a turf-based gang and stated that

the RVC:

> identify with the color blue, they use the number 13 to identify themselves as
> well, they refer to another as "cuz", they use 18-22-3 and 2-11, which
> represent Raza Varrios Crips, the 18th, the 22nd and the third letter of the
> alphabet.  The 2 and 11 represent the second and 11th letters of the
> alphabet, which is "B-K", which is a derogatory term they use to identify
> themselves as Blood Killers.
>       Tattoos on the right hand, three dots which represent dead [sic], jail,
> [and] hospital.  And they claim north side of Aransas Pass, Texas, use the
> letters "A.P.T.", which represents Aransas Pass, Texas, as well as the
> numbers 361.  Gang members will write blue graffiti on walls in the
> neighborhoods to mark their particular territorial boundaries.

Leal testified as to the execution of a search warrant on appellant's residence.

Appellant had a blue bandana hanging on the wall and numerous other gang-related

---

[11] Appellant was depicted in several pictures contained on his MySpace page.  In these pictures, which were admitted into evidence, appellant was shown throwing RVC gang signs, associating with known RVC members, including Ortiz, and wearing the colors of RVC.

paraphernalia in his room. Also in his room, appellant had several monitors for surveillance cameras, a dollar bill displayed that had the face of "Scarface," a fictional cinematic gangster, a security box with the letters "B" and K" prominently displayed, and some ammunition. Leal also found that the initials "RVC" were carved into a tree at the back of appellant's residence. Investigators found a collection of photographs at appellant's residence depicting appellant in various poses with known gang members. Leal testified that the RVC's territory is the north side of Aransas Pass and that appellant's residence was located on the north side of Aransas Pass. However, Leal noted that no gun was found in appellant's room and that Ortiz's red Mercury was not found at the residence.

**E. Perez's Testimony**

Perez testified that he had worked for the Aransas Pass Police Department for approximately four years and that he served as a detective. Based on his experience, Perez noted that RVC members regularly engaged in "[s]imple assaults to aggravated assaults, deadly conducts, graffiti cases, [and] robbery case[s]" and that he had investigated several of these cases.[12] Perez stated that he had recently investigated an aggravated assault and deadly conduct case involving RVC members. Perez also stated that on one instance in either 2004 or 2005, appellant admitted to being a member of a criminal street gang; however, no report was filed.

Perez later testified that he participated in the investigation of Olivares's apartment. While there, Perez found two bullets: one underneath a vehicle's right rear tire and

---

[12] In particular, Perez mentioned an aggravated assault case occurring at "the Ramos area located at 360 South Tech Street." In that case, appellant and Samuel Lopez, a suspected but not confirmed RVC member, were indicted.

9

another in the street. Perez then went to the Limmons' house to investigate another shooting. Perez found Garza, Dennis, and John there. Perez observed that John's car had a bullet hole in it. Perez found "a jacket of a projectile, as well as some lead" inside the car. Later, Garza and Dennis provided him with signed statements while John provided an unsigned statement.

Perez also participated in the search of appellant's residence. Perez noted that Ortiz and appellant lived in the same house with Beatriz Garcia. While searching the house, Perez found a Glock model handgun and two magazines in Ortiz's bedroom but found no handguns in appellant's bedroom. The handgun was collected as evidence; the handgun and the bullets found at Olivares's apartment were then sent off for ballistics analysis. According to the ballistics testing, the bullets found at Olivares's apartment did not match the handgun; however, the bullets did match a Chinese S.K.S. assault rifle found by Perez in a vehicle parked at appellant's house. This vehicle was not the red Mercury; a later search of the red Mercury yielded nothing.

As elicited on cross-examination, Perez admitted that he did not conduct: (1) any tests to conclude how long the bullet had been at the scene or whether the bullet was "hot or cold"; (2) a gun residue test on appellant because the department did not have any tests at the time; or (3) a fingerprint test on the handgun. In addition, investigators did not test for skid marks in the road in front of Olivares's apartment.

## F. Appellant's Motion for Directed Verdict

After the State rested its case-in-chief, appellant moved for a directed verdict. The trial court denied appellant's motion, and appellant proceeded to call witnesses to testify on his behalf.

## G. Jones's Testimony

Jones testified that he was the Chief of Police for the City of Aransas Pass and that he had served in that position for four-and-one-half years. Jones described the various policies of the police department. Jones stated that the department had $15,000 allocated for training and supplies, including gun residue kits, but that it is the job of the police captain to either obtain a kit from a neighboring police department or order new ones. Jones also stated that: (1) it is the department's policy to fulfill every request for a gun residue test; (2) the department can request additional funds from the City Manager to fulfill a request; and (3) no request for a test or additional funding was ever made in the present case.

On cross-examination, Jones testified that the reason the department was out of gun residue kits was because they were used up on several drive-by shootings that had recently occurred in the city.

## H. Cisneros's Deposition Testimony

Cisneros, then serving in the United States Navy, testified that she worked for Dunes Condominiums with Beatriz and that she lived in Beatriz's house during the month of June 2007. Appellant and Ortiz also lived in the house; their bedrooms were upstairs. On the night of June 20, Cisneros was in Beatriz's master bedroom watching television. Later that night, she heard "incoming shots." She immediately left the bedroom and saw appellant, Beatriz, Ortiz, and Beatriz's daughter downstairs. Cisneros testified that prior to the gunshots, she had last seen appellant go upstairs at about 11 p.m. Cisneros last saw Ortiz go upstairs around 9 p.m. Cisneros noted that between the hours of 11 p.m. and 12 a.m., she and Beatriz were downstairs talking in the dining room and that she believed

11

that appellant was upstairs.

On cross-examination, Cisneros denied having any knowledge as to whether appellant or Ortiz were gang members. However, she noted that she has never gone upstairs into appellant's or Ortiz's rooms. She also denied ever seeing guns, weapons, or drug use in the house. Cisneros testified that she was present during the search of the house, but she denied ever seeing any handguns or rifles removed from the house. She later recanted and stated that "I was not home during the search of the home." Cisneros admitted that she did not have any personal knowledge as to whether appellant and Ortiz were really upstairs that evening.[13] After being prompted by the State, Cisneros then remembered that several of appellant's and Ortiz's friends had stayed over at the house that night. Cisneros volunteered to give the police a statement as to the whereabouts of appellant and Ortiz that night; however, she failed to make time to do so.[14] When asked why she volunteered, Cisneros stated that "I did it because Beatrice [sic] is a good friend of mine and I wanted to because I was there. And also, I am a witness, so I don't see why not, ma'am." She also admitted that Beatriz had brought her to the deposition and that Beatriz lets her stay at the house on occasion.

**I. Lopez's Testimony**

Lopez testified that she lived in Aransas Pass with her common-law husband and her three children, including Benito Lopez and J.J. According to Lopez, on the night of June 20, J.J. was at home because they were very strict about him completing his

---

[13] In fact, she admitted that she assumed appellant and Ortiz were upstairs because "Beatrice [sic] didn't ask me where they were, so."

[14] When asked on re-direct about why she failed to give the police a statement, Cisneros noted "No reason, sir. Just—I guess I was, like, slacking, sir."

probation. Lopez, however, only recalled that J.J. ate dinner with the family; she was not sure about what exactly J.J. was doing the rest of the evening even though she insisted that he did not leave the house.

On cross-examination, Lopez denied that either Benito or J.J. were members of the RVC. However, Lopez did admit that Benito does not live with her and that it was possible that he is a member of the RVC. When presented with various photographs offered into evidence by the State, Lopez identified Benito and appellant in several pictures together with Benito wearing a blue bandana over his face. In another picture, Lopez identified Benito and Ortiz. In this picture, Ortiz was "doing something with his fingers," but Lopez denied having any knowledge of gang signs.

## J. Adelita's Testimony

Adelita testified that she lived in Aransas Pass with her common-law husband and four daughters. Adelita noted that she also has a son, Angel Garcia, and that her sister is Beatriz Garcia.[15] At the time of trial, Angel was nineteen years old and not living in Adelita's trailer; however, on the night of the incident, Angel was living there. Adelita stated that she worked at the Dunes Condominium with Cisneros and Beatriz. She further stated that she lived four blocks away from Beatriz and that it was a ten-minute walk to her house. Angel did not have a car at the time of the incident, so Adelita's ex-husband, Marcello Baizabal, would drive Angel to work.

On the night of the incident, Adelita recalled Angel coming home from work and staying home the remainder of the night "because he had to get up early the next morning to go to work." Adelita stated that there was no way Angel could have left the trailer that

---

[15] Adelita testified that appellant and Angel are cousins.

13

night because he usually stays home during the week, she regularly checks up on her children prior to going to bed around 11 p.m., and the back door of the trailer cannot be opened without a set of keys which only she and her husband possess. Neither Adelita nor her husband opened the back door for Angel on the night of the incident.

On cross-examination, Adelita testified that on June 21, 2007, Angel was scheduled to work at the Sandpiper Condominiums in Port Aransas; however, when shown a picture taken by police at Beatriz's house on June 21, Adelita acknowledged that one of the men in the picture was Angel. Adelita denied having any knowledge of Angel possessing an assault rifle or being in the RVC. Later, Adelita admitted that she was related to Lopez because "she's married to my cousin" and that Angel hangs out with Benito and J.J. After viewing a photograph offered into evidence by the State, Adelita recognized Angel as holding a blue bandana and posing next to J.J. and appellant. In other photographs, Adelita recognized Lupe and Benito and Angel and Benito posing together wearing blue shirts and blue bandanas and making gestures with their hands. Adelita also admitted that the pictures could have been taken in Beatriz's house.

**K. Beatriz's Testimony**

Beatriz testified that she worked at the Dunes Condominiums as a supervisor of housekeeping. During the month of June 2007, Beatriz allowed Cisneros to live with her. As a supervisor of housekeeping, Beatriz had access to the time machine used to manage employee work schedules. Employees were required to punch in when they arrived at work and to punch out when they left work. Beatriz stated that on the day of June 20, Cisneros was not working.

At the time of trial, Beatriz had lived at her house in Aransas Pass for three years.

Also living at the house was appellant, Ortiz, her fourteen-year-old daughter, and, for a time, Cisneros. Beatriz testified that Ortiz was her "blood cousin." She further testified that during the month of June 2007, appellant was recovering from gunshot wounds sustained on his arm and upper hip. As a result of his injuries, appellant was not working during the month of June 2007.

With respect to the layout of the house, Beatriz noted that appellant, Ortiz, and her daughter all had separate rooms upstairs and that Cisneros stayed downstairs. She further noted that appellant would have been unable to exit the house by jumping from his upstairs window because of his injuries and the fact that she could hear everything going on upstairs even while watching television in her master bedroom. Beatriz then recounted her experiences with Officer Perez. Specifically, Beatriz stated that her relationship with Perez had been bad for at least two-and-a-half years because Perez:

| A. [Beatriz] | . . . shows up to my residence, and he's always accusing my boy and my cousin of stuff. |
|---|---|
| Q. [Muñoz's counsel] | Your boy Jesus? |
| A. | Jesus Muñoz and Guadalupe Ortiz. |
| . . . . | |
| A. | Points fingers. Usually when I call him—usually I call because I hear gunshots around the neighborhood late at night all hours. He always makes comments like, *What did you boys do? Or, Guadalupe, what did you do? Or, Jesus what did you do now?* I told him, *I'm the one that called you, there is no reason to come to my house and accuse my boy of something because I'm the one that called you.* |

(Emphasis in original.) Beatriz noted that Perez did not come to investigate the shooting allegedly perpetrated by the Limmon boys until the following morning around 8:30 or 9:00

15

a.m.[16]

On the night of June 20, Beatriz made dinner for appellant, Ortiz, Cisneros, and her daughter. After finishing dinner, friends of appellant and Ortiz came by. The group of friends, including Daniel Flores, Timothy Glynn, Colton Warren, and Austin Sampson, went into the play room of the house with appellant and Ortiz.[17] Beatriz last saw Ortiz downstairs at around 9 p.m. and appellant around 11 p.m. She did not see either appellant or Ortiz again until midnight.

After the boys went upstairs, Beatriz, Cisneros, and Beatriz's daughter went into Beatriz's master bedroom to watch a movie. At around midnight, Beatriz, asleep at the time, awoke to gunshots fired at her house; she called the police using her cell phone. This was the second time that day that Beatriz had heard gunshots fired in the direction of her house. When she heard the gunshots that night, Beatriz ran to the front of the house, opened the door, and simultaneously called the police. She recalled hearing and seeing appellant run down the stairs. She also saw Ortiz running down the stairs with "Daniel Flores, Timothy [Glynn], Colton [Warren] and Austin [Sampson]." Beatriz remembered that appellant went outside to seek help.

Beatriz denied having any knowledge of appellant being in a gang or of any gang meetings occurring at her house. Beatriz later testified that she regularly cleaned appellant's room and that she never saw any handguns, rifles, or bullets in his room. She denied ever seeing a silver handgun anywhere in her house or car.

---

[16] The State later re-called Perez to the stand, and he testified that the reason for the delay in the investigation was because Beatriz had requested that he wait until the following morning to come by and investigate.

[17] The record contains testimony from Leal that Timothy Glynn, Colton Warren, and Austin Sampson were confirmed gang members.

16

On cross-examination, Beatriz testified that as a result of his gunshot wounds, appellant was only able to climb the stairs "one at a time with a little cane" and that he was unable to drive a car. Beatriz admitted that Ortiz owned a red car. She also denied any knowledge of the RVC, and she denied ever asking appellant if he was a member of the RVC. Law enforcement officers regularly accused appellant of being a gang member, but Beatriz never found it necessary to question appellant about it. Beatriz later admitted that parties were thrown at her house by appellant while she was home. Several of appellant's friends who were present the night of the shooting attended his parties. When presented with pictures offered into evidence by the State, Beatriz readily recognized "Ray Thomas, Angel Garcia, Samuel Lopez, St. John Lopez, Jesus Muñoz" and "Colton, Austin, Timothy and I believe that's Aaron." She also recognized Benito in a picture with appellant. Beatriz never went to the police department to make a statement regarding the drive-by shooting that occurred at her house. Moreover, Beatriz admitted that she was aware of weapons in the house: "a big one and another smaller one." Beatriz agreed that the big one was likely to be a rifle and the small one was likely to be a handgun. She found the guns in Ortiz's room, but she was uncertain as to whether appellant could have gotten the rifle from Ortiz's room on the night of June 20.

## II. STANDARD OF REVIEW

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given

17

to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-39; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. *Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and direct evidence cases are examined using the same standard of review. *Id.*

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson*, 204 S.W.3d at 414-15. After considering all of the evidence in the record related to appellant's sufficiency challenge, we compare the evidence weighed by the jury that tends to prove the elemental fact in dispute with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record

18

that the great weight and preponderance of the evidence contradicts the verdict. *Watson*,
204 S.W.3d at 415.

We measure the sufficiency of the evidence by the elements of the offense as
defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002,
pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the
indictment, and would not unnecessarily increase the State's burden of proof." *Malik*, 953
S.W.2d at 240. A person commits the offense of engaging in deadly conduct "if he
knowingly discharges a firearm at or in the direction of . . . one or more individuals; or . .
. a habitation, building, or vehicle and is reckless as to whether the habitation, building, or
vehicle is occupied." TEX. PENAL CODE ANN. § 22.05(b). Moreover, a person commits the
offense of aggravated assault if he "uses or exhibits a deadly weapon during the
commission of an assault."[18] *Id.* § 22.02(a)(2). A person engages in illegal organized
criminal activity "if, with the intent to establish, maintain, or participate in a combination or
in the profits of a combination or as a member of a criminal street gang, he commits or
conspires to commit . . . deadly conduct . . . ." *Id.* § 71.02(a)(1).

### III. ANALYSIS[19]

In his first three issues, appellant contends that the evidence is legally and factually
insufficient to support his conviction for aggravated assault and engaging in deadly

---

[18] Section 22.01 of the penal code provides that a person commits the offense of assault if he " . . . intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse . . . ." *Id.* § 22.01 (Vernon Supp. 2008).

[19] As allowed by the appellate rules, the State has not filed an appellate brief in response to appellant's contentions. *See Siverand v. State*, 89 S.W.3d 216, 219 (Tex. App.–Corpus Christi 2002, no pet.) ("The Texas Rules of Appellate Procedure require appellant to either file a brief or state that he no longer desires to prosecute the appeal. TEX. R. APP. P. 38.8(b). However, there is no corresponding rule requiring the State to file a brief in response to appellant's brief.").

conduct. Specifically, appellant argues that there was insufficient evidence to demonstrate that he committed the offenses of: (1) aggravated assault as to Garza; (2) aggravated assault as to John and Dennis; and (3) deadly conduct as to Olivares's apartment or John's vehicle.

### 1. Aggravated Assault—Garza

Appellant argues that because Garza did not testify at trial, there was no evidence demonstrating that he committed the offense of aggravated assault as to Garza. The following is appellant's entire argument as to Garza:

> The evidence in this case is insufficient in many regards. First, one complaining witness, Juan Garza, did not show up to court to testify. Only the complaining witness can testify as to whether they felt threatened by a certain person. The record has absolutely no evidence or testimony concerning whether that element was satisfied concerning the aggravated assault count, (count 1) on Juan Garza.

(Record citations omitted.) We disagree.

Appellant has not cited nor are we aware of any authority requiring that a victim testify as to whether a threat of imminent bodily injury was communicated. *See, e.g., Sosa v. State*, 177 S.W.3d 227, 229-31 (Tex. App.–Houston [1st Dist.] 2005, no pet.) (affirming a defendant's conviction for aggravated robbery even though the victim did not testify in court; the defendant was identified by other eyewitnesses).

In the present case, Olivares, John, and Dennis all testified that Garza was present at Olivares's apartment at the time the drive-by shooting occurred. They each testified that John and Garza were talking on Olivares's porch when appellant and Ortiz drove past the apartment. John and Dennis identified the car in the drive-by shooting as a red Mercury driven by Ortiz. Moreover, both John and Dennis testified that they saw appellant, a passenger in Ortiz's car, fire six to seven gunshots in their direction that night and heard

20

appellant yell "motherfucker." *See Robinson v. State*, 596 S.W.2d 130, 133 n.7 (Tex. Crim. App. 1980) ("The display of a deadly weapon of and within itself constitutes a threat of the required imminent harm.");[20] *see also Lunn v. State*, 753 S.W.2d 492, 495-95 (Tex. App.–Beaumont 1988, no pet.) (holding that evidence was sufficient based upon a victim's recognition of defendant's eyes, voice, and words used during the commission of the assault).

On the other hand, Cisneros and Beatriz testified that appellant and Ortiz were entertaining friends at Beatriz's house on the night of the incident. Beatriz stated that appellant had sustained gunshot wounds that hindered his ability to walk and that she would have heard him leave; she therefore concluded that appellant could not have gotten out of the house that night. She further stated that appellant would have been in severe pain had he jumped out of his upstairs window. However, neither Beatriz nor Cisneros were certain that either appellant or Ortiz were in their rooms at the time the drive-by shooting occurred.

The jury was the exclusive judge of the facts proved and of the weight to be given to the testimony. TEX. CODE CRIM. PROC. ANN. art. 38.04. Therefore, the jurors were free to accept or reject any or all of the witnesses' testimony. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)); *see also Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) ("The jury is in the best position to judge the credibility of

---

[20] Section 1.07(a)(17) of the penal code provides that a "[d]eadly weapon" is "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury . . . ." TEX. PENAL CODE ANN. § 1.07(a)(17) (Vernon 2003). The court of criminal appeals has held that a firearm is a per se deadly weapon. *See Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985). Therefore, the State was not required to elicit testimony as to the deadly characteristics of the firearm used.

21

a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record."). In convicting appellant, the jury obviously chose to accept the aforementioned testimony offered by the State and rejected the testimony offered on appellant's behalf. We must defer to the jury's determination. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.") (citing *Jackson*, 443 U.S. at 326).

Based on the foregoing, we conclude that the cumulative force of all the incriminating circumstances is sufficient to support appellant's conviction for aggravated assault as to Garza. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49. Moreover, the verdict is not against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15. Appellant's first issue is overruled.

### 2. Aggravated Assault—John and Dennis

On appeal, appellant contends that law enforcement was required to conduct gun residue tests on him to determine if it was he who fired the gun that night. Appellant has not cited to, nor are we aware of, any authority requiring law enforcement to conduct a gun residue test to prove that a defendant has committed an aggravated assault. Appellant further notes that the evidence is insufficient because the "silver handgun" that John and Dennis testified to seeing that night was never found. This Court has held that contradictory testimony from witnesses does not render the evidence insufficient. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Mercado v. State*, 695 S.W.2d 25, 29 (Tex. App.–Corpus Christi 1985), *aff'd*, 718 S.W.2d 291 (Tex. Crim. App. 1986)). In any event, Texas courts have affirmed convictions even

though the alleged deadly weapon was never found. *See, e.g., Hunter v. State*, Nos. 01-00-00722-CR & 01-00-00726-CR, 2001 Tex. App. LEXIS 4532, at **4-6 (Tex. App.–Houston [1st Dist.] July 5, 2001, no pet.) (mem. op., not designated for publication) (affirming a conviction even though the firearm used in the commission of the offense was never found); *Jeffery v. State*, No. C14-84-329-CR, 1985 Tex. App. LEXIS 6581, at *3 (Tex. App.–Houston [14th Dist.] Apr. 25, 1985, no pet.) (mem. op., not designated for publication) (upholding a conviction even though the deadly weapon was not found). Moreover, the record reflects that law enforcement recovered bullets from underneath John's car and from Olivares's apartment that originated from an assault rifle recovered from Beatriz's property where both appellant and Ortiz lived.

Olivares testified that, on the night of June 20, both John and Dennis were at her apartment talking to Garza on the porch. Furthermore, both John and Dennis stated that they saw appellant fire six to seven gunshots in their direction from a car driven by Ortiz. *See Robinson*, 596 S.W.2d at 133 n.7; *see also Lunn*, 753 S.W.2d at 495-95. Appellant also yelled "motherfucker" at them. *See Robinson*, 596 S.W.2d at 133 n.7; *see also Lunn*, 753 S.W.2d at 495-95. We therefore conclude that the evidence adduced at trial is sufficient to support appellant's conviction for aggravated assault as to John and Dennis. *See Hooper*, 214 S.W.3d at 13; *see also Watson*, 204 S.W.3d at 414-15; *Guevara*, 152 S.W.3d at 49. Accordingly, we overrule appellant's second issue.

### 3. Deadly Conduct as to Olivares's Apartment or John's Vehicle

Appellant contends that the evidence was insufficient to support his conviction for deadly conduct as to Olivares's apartment and John's vehicle. As previously mentioned, Olivares, John, and Dennis testified that appellant fired six to seven gunshots in the

23

direction of John and Garza on the night of June 20. John and Garza were on Olivares's porch talking when the drive-by shooting occurred. Several bullets struck Olivares's apartment and at least one bullet penetrated John's vehicle. Olivares and her daughter were inside the apartment at the time of the shooting. In addition, Dennis was inside John's vehicle at the time of the shooting. The jury was rational in concluding that appellant recklessly fired gunshots at a habitation—Olivares's apartment—and at a vehicle—John's vehicle—without regard to whether either were occupied.[21] *See* TEX. PENAL CODE ANN. § 22.05(b). We therefore conclude that the evidence adduced at trial is legally and factually sufficient to support appellant's conviction for engaging in deadly conduct. *See id.* Accordingly, we overrule appellant's third issue.

### 4. Lay Testimony About Criminal Street Gangs

In his fifth issue, appellant contends that the trial court erred in allowing lay testimony concerning criminal street gangs. Specifically, appellant takes issue with Dennis's testimony as to appellant's alleged gang membership; appellant alleges that the State did not lay the proper predicate to admit this testimony.

### A. Standard of Review

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2007). We should uphold the trial court's judgment unless the trial court's decision lies outside the "zone of reasonable disagreement." *Id.*

---

[21] As provided by section 22.05(c) of the penal code, "[r]ecklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded." TEX. PENAL CODE ANN. § 22.05(c).

24

**B. Preservation of Error**

Requisite for review of any complaint on appeal is preservation of error. TEX. R. APP. P. 33.1(a); *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (en banc). To preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court stating the specific ground for the desired ruling if the specific grounds were not apparent from the context. *Adams v. State*, 180 S.W.3d 386, 389 (Tex. App.–Corpus Christi 2005, no pet.). The complaining party must also obtain an adverse ruling on the objection. *Id.* Generally, a party's failure to timely and specifically object at trial forfeits any error. TEX. R. APP. P. 33.1; *see Blue*, 41 S.W.3d at 131.

The record does not reflect that appellant objected to Dennis's testimony pertaining to his membership in the RVC. We therefore conclude that appellant failed to preserve this issue for appeal. *See* TEX. R. APP. P. 33.1; *see also Blue*, 41 S.W.3d at 131. Even assuming that appellant had preserved this issue, we conclude that the trial court's error, if any, in allowing Dennis to testify as to appellant's gang membership was harmless because it was merely cumulative of Leal's testimony. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in the admission of testimony was harmless in light of other properly admitted evidence proving the same fact). Accordingly, we overrule appellant's fifth issue.

### 5. The Enhancement Paragraph of the Indictment

In his fourth issue, appellant argues that the evidence is legally and factually insufficient to support the jury's finding that he was a member of a criminal street gang when the alleged offenses occurred.

## A. Applicable Law

Section 71.02 of the penal code states that:

(a) A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit one or more of the following:

> (1) murder, capital murder, arson, aggravated robbery, robbery, burglary, theft, aggravated kidnapping, kidnapping, *aggravated assault*, aggravated sexual assault, sexual assault, forgery, *deadly conduct*, assault punishable as a Class A misdemeanor, burglary of a motor vehicle, or unauthorized use of a motor vehicle.

TEX. PENAL CODE ANN. § 71.02(a)(1) (emphasis added). Section 71.01(d) of the penal code defines a "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id.* § 71.01(d) (Vernon 2003).

## B. Discussion

Leal, a local investigator responsible for identifying gang members and maintaining a local gang database in conjunction with the Texas Department of Public Safety, testified that he uncovered appellant's MySpace page which included numerous references to the RVC and other gang paraphernalia. Also included on appellant's MySpace page were several pictures indicating that appellant regularly associated with known gang members; similar pictures were also found in appellant's bedroom. These pictures also demonstrated that appellant wore blue clothing, including a bandana, and threw gang signs that were known to be associated with the RVC. Moreover, Beatriz and Cisneros noted that appellant regularly associated with Timothy Glynn, Austin Sampson, Colton Warren, and other individuals whom authorities have previously determined to be gang members. In fact, both Beatriz and Cisneros admitted that Timothy Glynn, Austin Sampson, and Colton

Warren were spending the night at her house on the night of the incident. Moreover, Perez testified that appellant admitted to him on one occasion that he was a member of a gang and that RVC members regularly engaged in "[s]imple assaults to aggravated assaults, deadly conducts [sic], graffiti cases, [and] robbery case[s]." Based on the foregoing, we conclude that the jury was rational in finding that appellant was a member of a criminal street gang.

Because we have concluded that the evidence was sufficient to support appellant's convictions for aggravated assault and deadly conduct and that the jury was rational in concluding that appellant was a member of a criminal street gang, we find that the evidence was legally and factually sufficient to support appellant's conviction under section 71.02(a)(1) of the penal code. *See* TEX. PENAL CODE ANN. § 71.02(a)(1); *see also Hooper*, 214 S.W.3d at 13; *Watson*, 204 S.W.3d at 414-15; *Guevara*, 152 S.W.3d at 49. Therefore, appellant's fourth issue is overruled.

## IV. CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 15th day of January, 2009.

27